**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SELIM SERO,

                       Plaintiff,

    v.                                               No. 14-CV-25
                                               (DNH/CFH)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

SELIM SERO
Plaintiff <u>pro se</u>
146 Moeller Street
Binghamton, New York 13904

HON. RICHARD S. HARTUNIAN        SIXTINA FERNANDEZ, ESQ.
United States Attorney for the          Special Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER[1]**

    Plaintiff <u>pro se</u> Selim Sero ("Sero") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

that Sero was not without fault accepting an alleged overpayment of Supplemental

Security Income ("SSI") benefits, and that Sero was therefore not entitled to a waiver.

Dkt. No. 17.  The Commissioner cross-moves for a judgment on the pleadings.  Dkt.

_____

     [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

No. 19.  For the reasons which follow, it is recommended that the Commissioner's decision be affirmed.

## I. Background

Sero filed an application for SSI, which was granted on the basis of disability, on July 26, 2005.  T. 9.  Sero had a representative payee appointed from the Broome County Department of Social Services who, in connection with a Fair Hearing Request submitted in April of 2010, discovered and reported to the Social Security Administration (hereinafter "the Administration")  Sero's excess resources.  T. 9, 11; see also T. 76-83 (Fair Hearing Decision dated April 14, 2010).  In February of 2011, Sero received notification that he was placed on non-payment status with a charged overpayment.  T. 9, 14-24.

In that notification, it indicated that from November of 2010 through the present, Sero and his spouse retained resources worth more than $3,000, making them ineligible to continue receiving SSI payments.  T. 14.  Specifically, Sero was informed that as of November 2010, he had resources totaling approximately $11,000 more than the resource limit, composed primarily of seven vehicles that were titled to either himself or his spouse.  T. 23.

On February 16, 2011, Sero filed a Request for Reconsideration.  T. 25-27.  Sero stated that he did not own any of the vehicles; the vehicles, specifically a 1999 Audi Quattro, 1999 Mercedes-Benz ML430, and a 1996 Ford F150 truck, all belonged to his wife; two of his daughters required vehicles to go to school but are too young to have them titled in their names; and the other unaccounted for vehicle was "junked" in

2

December of 2010.  T. 14.  On February 25, 2011, the Administration responded to

Sero's request, which they liberally construed as one to waive the collection of the

overpayment of $2,788.  T. 28.  The Administration scheduled a personal conference

with Sero on March 3, 2011.  T. 28.  After the conference, Sero received

correspondence from the Administration dated March 22, 2011 which again denied his

request to waive collection of the overpayment because "[v]ehicles count as resources .

. . [and there is an] indication that [Sero] currently ha[s] 4 vehicles: 99 Audi, 99

Mercedes, 01 Mitsubishi, [and] 95 Ford pickup," and given such, Sero was "still over the

resource limit and not eligible to receive SSI."  T. 30.  The Administration went on to

explain that:

> [w]hen [Sero] receive[d] SSI [he was] given instructions to
> report all income and resources to [the Administration].  This
> prints on letters and on the application. [The Administration]
> w[as] not informed of the vehicles [in Sero and his spouse's
> possession] until the Department of Social Services advised
> [them] that there were numerous cars in [Sero's] wife's
> name.  The values of these vehicles places [Sero] over the
> resource limit.  Therefore, based on the facts [the
> Administration] ha[s], [it] cannot waive the collection of this
> overpayment[; thus, Sero was directed that he] . . . must pay
> this money [totaling $2,788] back.

T. 31.

On July 8, 2011, the Administration sent Sero a letter indicating that they had

received payments from him and his outstanding balance was $1,285.30.  T. 33;

see also T. 11 (indicating payments of $53 and $1,502.70 resulting in the balance of

$1,285.30).  On or about July 21, 2011, Sero filed another request for waiver of the

overpayment recovery citing that "[t]he overpayment was not [his] fault and [that he

could] not afford to pay the money back and/or [repayment] . . . [was] unfair . . . ."  T.

3

37; see also T. 45-47.  As of this date, Sero contended that the vehicles and owners of said vehicles in his household were as follows: A Ford F150 owned by his wife with a value of $200; an Audi A6 owned by his nineteen year old daughter with a value of $600; and a Honda motorcycle owned by himself with a value of $50.  T. 40.  On August 5, 2011, the Administration affirmed the termination of pay status.  T. 48-50.

Sero then timely requested a hearing by an administrative law judge ("ALJ").  T. 51-53.  Attached to his request for a hearing was a written explanation in which Sero discussed various problems with law enforcement and perceived discrimination and purposeful inaccessibility to public assistance programs.  T. 52.  Sero also explained which vehicles were in his possession and their respective worth.  T. 53.  Specifically,

> [Sero] currently ha[s] four cars which [he] ha[d] paid two
> hundred dollars [a piece for] because they are all old cars . .
> . [Sero's 1996] Ford F150 [was purchased for] 200 dollars . .
> . from a private seller about seven days ago.  Another car is
> [the 1997] Mitsubishi Eclipse . . . [which was also purchased
> for] 200 dollars from a private seller about 4 years ago.
> [Sero's] third car is a [1999] Mercede[s] . . . [which he] paid
> 2,500 [dollars for] about a year ago from a private seller and
> finally the [1999] Audi A6 . . . bought about six months ago .
> . . [for] 200 dollars from a private seller . . . [Sero] never sold
> any [of the] cars . . . .

T. 53.  Sero again disagreed with the determination that his SSI benefits were discontinued, and, in the alternative, requested a waiver for any assessed over payment.  T. 9.

> After due notice, a hearing was scheduled initially for
> November 2011; but [Sero] requested a postponement; this
> was granted.  But when the hearing was re-set, for January
> 24, 2012, [Sero] once again asked for further postponement,
> on the basis of needing to obtain representation. [The ALJ]
> advised [Sero] that he had already had several months for
> this; but . . . once again granted the postponement.

T. 9; see also T. 97 (retaining counsel on January 19, less than a week before the hearing), 98 (requesting adjournment on January 19th due to counsel previous obligations in Albany on the same date Sero's hearing was scheduled), 100-101 (phone messages dated January 20th from counsel seeking adjournment and response from Chambers that a written explanation needed to be provided, and another message dated January 23rd from ALJ's chambers indicating that hearing would go forward as previously scheduled despite counsel's inability); 128-134 (transcript from proceedings held on January 24, 2012); 102-07 (Notice of Continued hearing dated January 27, 2012 indicating that a subsequent hearing would occur on April 6, 2014).

A hearing was conducted before ALJ Bruce Fein on April 6, 2012.  T. 135-88 (transcript of the hearing).  Sero, represented by counsel, and his son both testified at the hearing.  Id.[2]  During the course of the hearing, Sero testified about the vehicles which he owned and what their approximate values were.  He stated that his wife owned a 1999 Mercedes sport utility vehicle and a 1996 Ford F150 truck.  T. 142, 145-46; see also T. 122-25 (titles for the '99 Mercedes and '96 F150 in Sero's wife's name and the '84 motorcycle in Sero's name).  Sero stated that the Mercedes was purchased for his wife by his daughter three years prior, thus he was unaware of what the car was purchased for.  T. 146, 165-66.  Sero owned a 1984 Honda Shadow motorcycle that was presently inoperable.  T. 143-44; see also T. 171.  His son was the titled owner of a 2001 Mitsubishi which was impounded by, and never subsequently retrieved from, the

---

[2] Sero "is [a] native Bosnian . . . and has only limited use of English," what was fully taken into consideration by the ALJ during the course of the hearing as well as his subsequent decision.  T. 9.

New Jersey Police.  T. 147-48, 151.  His daughter was the titled owner of a 1999 Audi A4 which was disposed of in a junk yard in or around the end of 2010 or the beginning of 2011.  T. 151-52, 175.  Sero testified that he had previously owned a 1995 Windstar van and 1998 Chevy Malibu, but both had been disposed of in the junk yard several years prior.  T. 152.  Sero also placed a 1998 Chevy Cavalier and 1997 Mitsubishi in the junk yard after the cars were involved in car accidents.  T. 153-55.  Lastly, Sero testified to owning a 1992 Plymouth Acclaim when he first arrived in the United States which was also disposed of in the junk yard approximately four or five years prior.  T. 154.  Sero concluded that, at the present, the only vehicles in his or his wife's possession were the '96 Ford F150, '99 Mercedes, and '84 Honda motorcycle.  T. 156-57.

During the course of the hearing, Sero was asked about various vehicle titles obtained from the New York State Department of Motor Vehicles.  T. 119-25 (copies of car titles).  Sero testified that none of the vehicles whose titles were produced in his childrens' names were previously titled to either himself or his wife.  T. 162-64.  Sero explained that the 1996 Audi A6 was owned by his daughter, who, when the title was issued in May of 2011, was 17 years old.  T. 159-61 (testimony), 121 (title).  Further, the 2001 Mitsubishi was owned by his son as of the date the title was issued in September of 2009.  T. 163-64; see also T. 170.  Sero's son testified that he is presently driving a '92 Mercedes.  T. 177; see also T. 125 (title dated November 28, 2011 indicating that Sero's son is the owner of a '92 Mercedes).

Accepted as part of the hearing record was a decision after a Fair Housing Hearing by the New York State Office of Temporary and Disability Assistance.  T. 76-83.  Sero

6

was seeking assistance paying rental arrears.  T. 76.  In the course of that hearing, it was noted that Sero stated that his SSI benefits could not be used to pay his rent as they were insufficient to pay for both his rent and personal expenses.  Specifically, Sero needed to utilize his SSI benefits to pay for his monthly expense of $300 for the five vehicles that he has insured, in addition to the expenses for fueling said vehicles and providing clothing and paying for the cell phone bills of his three children.  T. 77, 81.  At the time of the hearing in March of 2010, Sero's children were ages four, seventeen, and eighteen.  T. 77.

Also included as exhibits to the hearing record were correspondence records between Sero and the Social Security's Office of Disability Adjudication and Review.  T. 84-85.  In those notes it indicated that Sero claimed that he did not own any vehicles and that his wife owned a '99 Audi worth $2,000 and a '96 F150 worth $500.  T. 84. The note concluded that "even without the[ additional] vehicles listed . . . [which Sero contends he does not own] – [Sero] is over resources with the three vehicles he claims to have [– a] 99 Audi, 99 Mercedes, [and] 9[6] Ford."  Id.

On April 23, 2012, the ALJ issued a decision denying Sero's requests and concluded that the recovery of overpayments to Sero could not be waived.  T. 13. The ALJ concluded that:

> [Sero's] statements are not generally credible.  There was too much vague shifting around of these vehicular resources, especially among close family members, and too many inconsistent or imprecise assertions, particularly as to the actual value of any of the vehicles or when and how they had been gotten originally, or even where some of them are at the present time.  There is, above all, no substantial and/or convincing evidence, including documentation, . . . to support [Sero's] overall assertions.

> . . . [F]urther . . . [Sero] was at fault in creating the
> overpayment because he certainly knew, or should have
> known, that these vehicles, as a group, amounted to excess
> resources.  Nor is it credible that imposition of the
> overpayment now, and its eventual recovery through
> appropriate monthly withholdings, would defeat the purpose
> of Title XVI of the Act, because there would still be
> remaining sufficient funds for basic ongoing expenses of
> necessary and ordinary living . . . And it would certainly not
> be against equity and good conscience given the arguably
> deceptive shifting around of resources over a very
> considerable period of time . . . .

T. 12.

Sero filed a timely request for review, and on December 18, 2013, the Appeals

Council denied Sero's request, thus making the ALJ's findings the final decision of the

Commissioner.  T. 1-5.  This action followed.


## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla,"

meaning that in the record one can find "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28,

31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal

citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports

the decision." <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); <u>Halloran</u>, 362 F.3d at 31.

## B.  Determination of Benefits and Overpayment

"In order to be eligible for SSI an individual must be aged, blind or disabled and have income and 'countable resources' below specified statutory amounts."  <u>Singer v. Sec. of Health & Human Servs.</u>, 566 F. Supp. 204, 206 (2d Cir. 1983) (citing 42 U.S.C. § 1382(a)).  "Under 42 U.S.C. § 1382(a)(3)(A), a claimant is financially eligible for SSI benefits if his . . . resources, together with the resources of his . . . spouse, do not exceed $3,000."  <u>Rasheed v. Astrue</u>, No. 07-CV-2726 (NGG), 2010 WL 3036795, at *3 (E.D.N.Y. July 30, 2010).[3]  Resources are defined as "cash or other liquid assets or any . . . personal property that an individual (or spouse . . .) owns and could convert to cash to be used for his . . . support and maintenance."  20 C.F.R. § 416.1201(a).  In determining the resources a claimant owns, there is an exclusion for one vehicle, so long as its "total value does not exceed such amount as the Commissioner . . . determines to be reasonable."  42 U.S.C. § 1382b.  However, additional automobiles in

---

[3] Unpublished decisions will be annexed as exhibits to this Report-Recommendation and Order.

excess of the one allowed per the exclusions are considered a countable resource as it is personal property capable of conversion.

"An overpayment is a payment of an amount more than the amount due for a given period . . . If an individual receiving SSI benefits is incorrectly paid more than the amount he is entitled to, the Commissioner is authorized to seek a repayment of the excess amount of benefits."  Mesias v. Doe, No. 11-CV-2373 (RRM), 2012 WL 3704824, at *3 (E.D.N.Y. Aug. 24, 2012) (citing 20 C.F.R. §§ 416.537 & 416.550; 42 U.S.C. § 1383(b)(1)(A)); see also 42 U.S.C. § 404 (providing in relevant part that "[w]henever the Commissioner . . . finds that more or less than the correct amount of payment has been made . . . proper adjustment or recovery shall be made . . . ."). Federal regulations "allow[] for waiver of recovery of an overpayment . . . where (1) an overpayment has been made to an individual who is without fault, and (2) when adjustment or recovery would either defeat the purpose of the Act, or be against equity and good conscience."  Hannon v. Barnhart, 134 Fed. App'x 485, 486 (2d Cir. 2005) (internal quotation marks omitted) (quoting 20 C.F.R. § 404.506).  If the individual cannot satisfy the first prong of the analysis, namely that he or she was without fault, then the second prong need not be considered.  See Chlieb v. Heckler, 777 F.2d 842, 846 (2d Cir. 1985) (citations omitted).

> [F]ault will be found when an incorrect payment "resulted from" one of the following:
>
> (a) Failure to furnish information which the individual knew or should have known was material;
>
> (b) An incorrect statement made by the individual which he knew or should have known was incorrect (this includes the individual's furnishing his opinion or

conclusion when he was asked for facts), or

(c) The individual did not return a payment which he knew or could have been expected to know was incorrect.

Howard v. Secretary of Health & Human Servs, 741 F.2d 4, 7-8 (2d Cir. 1984) (citing 20 C.F.R. § 416.552). "No showing of bad faith is required; rather, an honest mistake may be sufficient to constitute fault[; moreover, t]he fact that the SSA may have been at fault in making the overpayment does not relieve the recipient from liability if the recipient was also at fault." Center v. Schweiker, 704 F.2d 678, 680 (2d Cir. 1983) (citations omitted). The burden of proof to show that waiver of overpayment should be applied falls on the plaintiff. See Hannon, 134 Fed. App'x at 487 (citing 42 U.S.C. § 404(b); 20 C.F.R. §§ 404.506, 404.507).

Liberally reading Sero's pro se complaint, he asserts that the ALJ was incorrect in affirming the continued recovery against the overpayment and failing to institute the waiver provision. However, substantial evidence supports the ALJ's decision as Sero was at fault for the overpayment.

Sero's recitation of which vehicles were under his ownership, when they were purchased, for how much, and when they were disposed of changed each time he filed paperwork or answered a question during his testimony. Initially, Sero admitted that three of the vehicles were registered to his wife, the '99 Audi, '99 Mercedes, and '96 F150. The Administration determined that the estimated value of these vehicles were $3,200, $4,200, and $200-$500 respectively. T. 23. Regardless of the ownership or whereabouts of the additional vehicles which the Department of Social Services identified, which Sero presently contends have either been disposed of or are in his

11

childrens' possession, the value of the Audi and the Mercedes alone exceed the resources limitation for a married couple, thus providing evidence to support the initiation of a recovery for overpayment.

To the extent that Sero has provided alternate valuations for these vehicles, those have been inconsistent at best.  In August of 2011, Sero stated that he paid $2,500 for the Mercedes, giving an approximate value for the car.  However, during his request for waiver of the obligation to repay in July of 2011, Sero did not include the '99 Mercedes in the list of vehicles his wife owned, essentially valuing the asset as zero because he claimed it did not exist.  However, during his hearing testimony he indicated that his daughter purchased the vehicle for her mother, conceding to the fact that his spouse had the vehicle as a resource but taking no position on what the actual or estimated worth of the vehicle was.

Sero's testimony at the hearing was also extremely vague and imprecise.  Most of the vehicles Sero was questioned about led to ambiguous explanations that the vehicles  were bought some unspecific number of years ago, from private dealers, generally for the cost of $200 regardless of the year, make, or model of the vehicle. Further, the ownership of the vehicles was nearly impossible to follow.  The best example would be the Audi.  First, there is confusion over whether there was one or two vehicles, as there is reference to an Audi A4 and an Audi A6, both manufactured in the year 1999.  Initially, Sero contended that his wife owned a '99 Audi.  Then, during his testimony, Sero stated that his daughter had a '99 Audi A4 which had been junked in 2010 or 2011.  Sero could not recall in whose name the car was titled.  However, a title dated May 16, 2011, a date shortly after the determination that SSI payments would

cease, indicated that Sero's daughter was the owner of a '99 Audi A6.  Sero also

testifies that the Audi was never in his wife's name, though the ultimate conclusion

comes after some confusion and waffling back and forth.

An administrative law judge has discretion to evaluate credibility of a claimant and to

make an independent judgment regarding the true extent of the claimant's symptoms.

Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir.1984).  It is the function of the

Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise

the credibility of witnesses, including the claimant."  Carroll v. Secretary of Health &

Human Servs., 705 F.2d 638, 642 (2d Cir.1983); see Gernavage v. Shalala, 882

F.Supp. 1413, 1419 n. 6 (S.D.N.Y.1995) (An administrative judge's determination with

respect to the credibility of witnesses is given great deference because the

administrative law judge heard the testimony and observed the demeanor of the

witnesses.).  Hence, an administrative law judge's decision to discount a claimant's

statements of symptoms must be accepted by a reviewing court unless it is clearly

erroneous.  Centano v. Apfel, 73 F.Supp.2d 333, 338 (S.D.N.Y.1999).

Here, the ALJ determined that Sero was at fault for the overpayment.  First,

substantial evidence supports both the valuation of these resources and the fact that

Sero's wife was the owner of these vehicles at the time in question.  Substantial

evidence also indicates that Sero knew about the existence and value of all of the

vehicles that his spouse owned.  These vehicles indisputably constituted excess

resources.  To the extent that Sero attempts to testify otherwise, such testimony does

not militate against this evidence given the ALJ's credibility findings, for which

deference is shown.  Further, Sero does not contend and no evidence would

substantially support the conclusion that Sero was unaware of the parameters within which he had to fall to receive SSI and the fact that ownership of multiple, valuable vehicles would render him ineligible given the income requirements.  Accordingly, the ALJ's decision should be affirmed regarding both the fact that collection of the overpayment and denial of the waiver.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 19) be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Date:  October 28, 2014
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

2010 WL 3036795
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Ahmad RASHED, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 07–CV–2726 (NGG). | July 30, 2010.

West KeySummary

1    **Social Security**
     👉 Income and resource limitations

     Substantial evidence supported an ALJ's
     determination that a supplemental security
     income (SSI) claimant was not eligible for
     benefits. The claimant failed to present credible
     evidence as to how he disposed of a $63,100
     settlement check and did not establish that he
     lacked resources in excess of the maximum
     amount allowed for SSI eligibility.

     1 Cases that cite this headnote

**Attorneys and Law Firms**

Ahmad Rashed, Brooklyn, NY, pro se.

Karen T. Callahan, United States Attorneys Office, Brooklyn,
NY, for Defendant.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

*1 Ahmad Rashed ("Rashed" or "Plaintiff") brings this *pro
se* action against Defendant Commissioner of Social Security
Michael J. Astrue ("Commissioner" or "Defendant") seeking
judicial review, under 42 U.S.C. § 405(g), of the Social
Security Administration's ("SSA") final decision denying his
claim for supplemental security income ("SSI") benefits.
(Compl. (Docket Entry # 1) 1–3.) The Commissioner moves

for judgment on the pleadings under Federal Rule of Civil
Procedure 12(c). (Comm'r Mot. (Docket Entry # 20) 3.) For
the following reasons, Defendant's motion is granted.

**I. BACKGROUND**

Plaintiff testified that in April 1998 he was injured carrying
a case of soda down the stairs of the grocery store where
he worked as a manager and attendant. (Administrative
Transcript (Docket Entry # 10) ("Tr") 178.) In June 2002,
Plaintiff applied for Title XVI supplemental security income
disability payments. (*Id.*) The SSA ruled that he was
financially ineligible to receive SSI benefits because he had
excessive resources. (Tr. 39.) Shortly thereafter, Plaintiff filed
a timely request for a hearing before an Administrative Law
Judge ("ALJ"). (Tr. 20.)

**A. ALJ Hearing**

In November 2005, Plaintiff appeared pro se before ALJ
Michael S. London. (Tr. 172.) At the hearing, the ALJ
explained that excess resources, over $3,000 for a couple,
render a claimant ineligible for SSI benefits. (Tr. 176.) The
ALJ then examined Plaintiff about his resources. (*See, e.g.,*
Tr. 178.)

Plaintiff testified that as a result of his injury, he stopped
working and began collecting $225 a week ($900 a month)
from workers' compensation in April 1998. (Tr. 183: *see*
Tr. 31.) Plaintiff claimed that during the time he received
weekly payments, his mother also lent him about $14,000.
(Tr. 183.) Plaintiff, however, did not submit any evidence that
he borrowed any money from his mother. (*Id.*) In December
1999, Plaintiff's weekly payments ceased, but he received a
lump sum settlement of $63,100 from workers' compensation.
(Tr. 184.) Plaintiff also collected food stamps between 1999
and 2005: from 1999–2001, $379 a month; from 2001–2004,
$389 a month; and from 2004–2005, $469 a month. (Tr. 185–
86.) During this time, Plaintiff collected an additional $225
in welfare payments for monthly expenses. (Tr. 189.)

Regarding his expenses, Plaintiff claimed that he paid $950
a month for rent from 1999–2004. [1] (Tr. 187.) Additionally,
he repaid his mother the $14,000 that she lent him before he
received the settlement. (*Id.*) Plaintiff testified that he gave
the remainder of the settlement to his brother who placed
the money into a safe deposit box in "the store" and then
gave Plaintiff money from the safe to pay for his rent or
bills. (Tr. 188.) Plaintiff submitted bills and invoices totaling

$13,284.92. [2] Plaintiff contended that he depleted all his settlement money in the beginning of 2004 and that from January 2004 to the date of the hearing he paid for rent and other living expenses with the food stamps and monetary assistance from his brother. (Tr. 188–89.) Plaintiff's brother did not testify at the hearing.

### B. The ALJ's Decision

**\*2** The ALJ found that Plaintiff had not "adequately explained or documented how he disposed of the $63,100 settlement check he received in December 1999 or [had] otherwise shown that he does not [have] resources in excess of the [maximum] amount allowed for SSI eligibility." (Tr. 22.) The ALJ, therefore, found that Plaintiff was ineligible for SSI benefits. (*Id.*) The ALJ reasoned that Plaintiff had not submitted any documentation that he no longer has any of the settlement money and that his testimony about how he spent the settlement money was not credible. (*Id.*) In evaluating the evidence, the ALJ found that the documentary evidence, as well as Plaintiff's testimony, lack credibility. (*See* Tr. 21.) Specifically, the ALJ focused on the leases, the $14,000 loan from Plaintiff's mother, and his claim that the entire balance of his settlement was held in his brother's safe. (*See id* .)

The ALJ noted that the lease forms, dated from April 2000 to April 2004, were "copyrighted by an internet legal company in 2004 and issued in July 2004, thus indicating or at least suggesting that all the lease forms ... were recently completed" and that the cover letter attached to the leases that Plaintiff claimed were written and signed by the landlord included a misspelling of his name. (Tr. 21.) Moreover, the leases stated that Plaintiff's rent from April 2000 to April 2004 was only $850 a month, even though Plaintiff testified that his rent was $950 a month at that time. (Tr. 21; *see* Tr. 95–105; *see* Tr. 187.)

The ALJ also found Plaintiffs testimony regarding the loan from his mother and the balance held by his brother to be incredible. (Tr. 21.) He presented no documentation of the loan or corroborating testimony by his mother to show that he had in fact received and repaid the loan. Plaintiff initially claimed that he needed to borrow that sum of money from his mother in order to pay for rent and living expenses from April 1998 through December 1999. (Tr. 182–83.) The ALJ noted, however, that at that time, Plaintiff was also receiving $900 a month from workers' compensation; he was "not persuaded" that Plaintiff needed to borrow money from his mother to pay for his incurred expenses before receiving his

workers' compensation settlement in December 1999. (Tr. 21; *see* Tr. 31.) Lastly, the ALJ found that Plaintiffs claim that his brother held the remainder of his settlement in a safe was "suspicious," "highly irregular," and incredible. (Tr. 21.)

In May 2007, the Appeals Council denied Plaintiff's request for review. (Tr. 3.) The ALJ's decision became the final decision of the Commissioner of Social Security. (*Id.*) Plaintiff timely filed this action in July 2007. (Compl.1.) Defendant answered and filed a motion for judgment on the pleadings. Plaintiff did not file an opposition to the Commissioner's motion.

## II. DISCUSSION

### A. Standard of Review

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a] fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings." The standard of review under a Rule 12(c) motion is the same standard applied under a Rule 12(b)(6) motion. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). To survive a Rule 12(b)(6) motion, the complaint must contain "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal.* 556 U.S. 662, ——, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009). A court is required "to accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,* 517 F.3d 104, 115(2d Cir.2008).

**\*3** In addition to considering the pleadings, the court may consider "statements or documents incorporated by reference in the pleadings ... and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Schaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). It may also consider matters of judicial notice. *Granger v. Harris,* No. 05–CV–3607 (SJF), 2007 WL 1213416, at \*3 (E.D.N.Y. Apr.17, 2007). The court "may take judicial notice of public records, such as documents filed in another court, to establish the existence of the documents and the fact of such litigation, but not for the truth of the matters asserted therein." *Id.* at \*1; *see Global Network Commc'n, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir.2006).

If a defendant's motion for judgment on the pleadings is unopposed, the court "could grant defendant's motion on default pursuant to Local Civil Rule 7.1." *Cortez v. Apfel,* No. 96–CV–7214(AGS), 1998 WL 601005, at \*1 (S.D.N.Y.

Sept.10, 1998). However, the court will award greater leniency to a *pro se* litigant and review the administrative record, the ALJ's decision and the Commissioner's motion papers in making its determination. *Id.; Diaz v. Charter,* No. 94–CV–5149 (FB), 1996 WL 612492, at *1 (E.D.N.Y. Oct.16, 1996). This court's review of the SSA's final decision is limited to determining whether the ALJ's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel.* 134 F.3d 496, 501 (2d Cir.1998). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted). It is "such relevant evidence as a reasonable mind might accept as adequate support to a conclusion." *Id.* (internal quotation marks omitted).

**B. Applicable Law**

Under 42 U.S.C. § 1382(a)(3)(A), a claimant is financially eligible for SSI benefits if his or her resources, together with the resources of his or her spouse, do not exceed $3,000. Resources are defined as "cash or other liquid assets or any real or personal property that an individual owns" and "could convert to cash to be used for his or her support and maintenance." 20 C.F.R. § 416.1201(a). A claimant is required to provide evidence to prove that he or she meets the financial requirements. 20 C.F.R. § 416.200. Even if a claimant's resources exceed the $3,000 limitation at the time of filing, the SSA may nonetheless find the claimant to be eligible if "he or she establishes by credible evidence that those resources have been 'spent down,' that is, that any excess above the resource limit has been eliminated" by the time of the SSA's final determination. *Nicolae v. Bamhart,* No. 04–CV–2068 (FB), 2005 WL 715929, at *1 (E.D.N.Y. Mar.28, 2005); *see Hudson v. Bowen,* 849 F.2d 433, 434 (9th Cir.1988).

The ALJ is responsible for weighing any conflicting evidence in the record and evaluating the credibility of any witnesses. *See Clark v. Comm'r of Social Security,* 143 F.3d 115, 118 (2d Cir.1998). However, in calculating whether a claimant has spent down excess resources, the ALJ is "free to disregard self-serving statements that cannot be verified." *Nicolae,* 2005 WL 715929, at *3 (citing *Hudson,* 849 F.2d at 434). The ALJ's credibility assessment is given great weight. *Id.*

**C. Application**

**\*4** The ALJ's eligibility determination is supported by substantial evidence on the record as a whole. The ALJ found that Plaintiff's resources exceeded $3,000 because he received monthly payments of $900 from workers' compensation after his injury in 1998 and a lump sum workers' compensation settlement of $63,100 in 1999. (Tr. 21–22 .) The ALJ did not rely on the documentary evidence that Plaintiff presented or his testimony because he found internal inconsistencies in the leases and because he found Plaintiff to be incredible. (Tr. 22.) This court gives deference to the ALJ's credibility finding. *See Tejada v. Apfel,* 167 F.3d 770, 776 (2d Cir.1999). Plaintiff did not meet his burden to counter the ALJ's findings and prove that he had disposed of the settlement before the SSA reached its final decision.

The lease agreements dating from April 2000 to April 2004 and the invoices for various other household expenses presented by Plaintiff as documentary evidence were insufficient to meet his burden because the leases were not reliable documents and the other expenses would not have spent down his excess resources. (*See* Tr. 89–114.) Plaintiff did not provide the SSA with any bank statements or documentation of his $14,000 loan borrowed from his mother. (*See id.*) Neither Plaintiff's mother nor brother testified to corroborate that he repaid his mother the $14,000 loan and that his brother held the balance of the settlement. (*See* Tr. 171–191.)

Therefore, the inconsistency between Plaintiff's testimony and the documentary evidence provided, in addition to the suspicious nature of the leases and the absence of witnesses to substantiate his claims, show that the ALJ was warranted in finding Plaintiff's assertions concerning the disposal of the settlement check as not credible. Thus, substantial evidence supports the ALJ's eligibility determination.

**IV. CONCLUSION**

For the foregoing reasons, the court grants the Commissioner's motion and the complaint is dismissed.

SO ORDERED.

---

Footnotes

1    Although Plaintiff claimed to have paid $950 a month for rent, the lease agreements he submitted into evidence dated back to April 2000. (Tr. 95–105.) Moreover, the lease agreements show that from April 2000 to April 2004 Plaintiff only paid $850 a month, and

from April 2004 to April 2005 he paid $950. (*Id.*). Additionally, Plaintiff proffered a letter from his landlord, which stated that from May 1999 to July 2004 Plaintiff paid a monthly rent of $950 and from August 2004 to August 2005 the rent had decreased to $450. (Tr. 92.) This cover letter, which was attached to the leases and allegedly written and signed by Plaintiff's landlord, misspelled the landlord's name.

2    Plaintiff submitted several copies of bills and invoices into evidence to document his expenses and show that he had disposed of his settlement money, including: cellular phone bills from 2004 and 2005 totaling $432.24 and $591.14, respectively, (Tr. 89–90); a traffic violation ticket for $220 from June 2004, (Tr. 91); an automobile purchase agreement for $8,237.01, (Tr. 93); electric bills from June 2003 to August 2005 worth a total of $2,186.01, (Tr. 107); a $408.52 invoice for bath towels, blankets and an ironing board, (Tr. 115); and medical bills totaling $1,210, (Tr. 116–17.)

---

**End of Document**                                            © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3704824
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Joel MESIAS, Plaintiff,
v.
John DOE (SSI Representative), Social
Security Administration, Defendant.

No. 11–CV–2373 (RRM).   |   Aug. 24, 2012.

**Attorneys and Law Firms**

Joel Mesias, Ozone Park, NY, pro se.

Arthur Swerdloff, United States Attorneys Office, Brooklyn, NY, for Defendant.

*MEMORANDUM & ORDER*

ROSLYNN R. MAUSKOPF, District Judge.

**\*1** Plaintiff *pro se* Joel Mesias ("plaintiff") brings this action against a representative of the Social Security Administration ("defendant" or "SSA"), pursuant to 42 U.S.C. § 405(g), seeking review of defendant's determination that plaintiff was not without fault in accepting an alleged overpayment of Supplemental Security Income ("SSI") benefits, and that plaintiff was therefore not entitled to a waiver. On June 29, 2012, defendant filed a motion for judgment on the pleadings. For the reasons set forth below, defendant's motion is GRANTED.

**BACKGROUND**

Plaintiff filed an application for SSI benefits on July 21, 1993, and, being found eligible due to schizophrenia, paranoia, and other psychotic disorders, began receiving benefits. (Administrative Record ("Admin.R.") (Doc. No. 18) at 12, 113.) [1] During 1999, plaintiff began working. (*Id.* at 12, 134, 172.)Plaintiff had reported earnings of $2,935.55 in 1999 and $21,021.97 in 2000. (*Id.* at 14, 118.)However, he continued to receive SSI benefits from SSA through October 2000. (*Id.* at 14.)SSA sent plaintiff notices on November 28, 2000 and July 30, 2002 assessing an overpayment in the amount of $4,666.42. (*Id.* at 54, 57, 117.)

On April 24, 2003, plaintiff requested a waiver of the overpayment. (*Id.* at 29.)In his request, plaintiff indicated "Yes" to the prompt "Did you tell us about the change or event that made you overpaid?"(*Id.* at 30.)However, in response to the next prompt "If yes, how, when and where did you tell us?," plaintiff answered that he wrote a letter to SSA and visited an SSA office, where he made a request for a waiver and explained that he was using the benefits for travel expenses and to pay off debt. (*Id.*) He also stated: "If anything at all should be returned, I think that in my opinion half or maybe a third of what you are asking for because of your own clerical error might be a more reasonable amount to work with."(*Id.* at 31.)In the request for a waiver, plaintiff did not state that he told SSA, either in the alleged letter or during his alleged visit to an office, that he had begun working again. On November 4, 2003, SSA informed plaintiff that his waiver request was not approved. (*Id.* at 37.)A personal conference was scheduled for November 26, 2003. [2] (*Id.* at 37.)On the same day, SSA determined that, because plaintiff had not timely notified SSA of his earnings, he was not without fault in causing the overpayment, and his request for a waiver was denied. (*Id.* at 39.)Plaintiff requested reconsideration of this decision, (*id.* at 43), and SSA again denied his request, (*id.* at 44).

On June 28, 2006, Administrative Law Judge ("ALJ") David Z. Nisnewitz conducted a hearing in the case. (*Id.* at 128.)Plaintiff testified that in 1997, he "came to the [SSA] office to try to get some help. They said that they would increase my SSI and promised me a refund and promised to help me find work...."(*Id.* at 133.)He then testified that he began working part-time for a retail data services company in September 1999. (*Id.* at 133, 138.)When asked whether he notified them that he went back to work, he replied, "Well, they had promised me a refund, and they were trying to help me find work, so I thought that they somehow knew that I was working when I started working.... I think Social Security knows everything...."(*Id.* at 137.)He then testified that SSA contacted him to inquire about his employment status about three months after he started working. (*Id.* at 137.)Thereafter, the following exchange took place:

  **\*2** Q But did you ever notify the [SSA] that you went back to work?

  A More or less, I did six months after I started working.

  Q How did you notify them?

A They had contacted me, and I called them up, and we agreed—

Q Well, why did you continue to take the money if you knew you were working?

A Take the money? I didn't have enough money to get by on. I was just evicted. I lost everything. I didn't even have any clothes to go to work with.

(*Id.* at 141.)He also testified that he did not know who he spoke to during the call, but that he did receive publications regarding SSI benefits, including "How Your Earnings Affect Your SSI Payments."(*Id.* at 147.)

In a decision dated March 28, 2007 ("the first ALJ decision"), ALJ Nisewitz found that the overpayment could not be waived because plaintiff was not without fault in accepting it. (*Id.* at 101–08 .)In a decision dated May 6, 2009 ("the first Appeals Council decision"), the Appeals Council vacated the first ALJ decision, remanded the case, and instructed the ALJ to determine whether plaintiff's paranoid schizophrenia impacted his ability to understand and comply with the SSA reporting requirements. (*Id.* at 122–25.)

On September 21, 2009, ALJ Nisewitz held a second hearing at which plaintiff appeared and was represented by Victoria C. Salzano. (*Id.* at 161.)Plaintiff testified that he worked some in February of 1999 and then began working again in October 1999. (*Id.* at 167, 172–74.)He also testified that he earned between $19,000 and $33,910 per year from 2001 to 2006. (*Id.* at 168–70, 174.)He described his employment duties with Retail Data Services (RDS), for whom he began working in late 1999, which offers a price-checking service to retail businesses that facilitates price competition. RDS employees are provided with a list of items; they are expected to search for those items in competing stores and check their prices. (*Id.* at 169–70.)

Plaintiff testified that he had not been hospitalized for paranoid schizophrenia or any other condition since 1995. (*Id.* at 171.)He admitted that he had an alcohol problem in 1994 and 1995 and "throughout most of [his] life, really."(*Id.* at 172 .)Despite that he was treated by a psychiatrist on an outpatient basis during this period, he testified that his mental status did not prevent him from working. (*Id.* at 174.)He also testified that he was taking medication, but that it was discontinued sometime around the end of 1998. (*Id.* at 175.)Plaintiff acknowledged that when he filed his

application to receive SSI benefits he signed a statement that he would inform the agency if he went back to work. (*Id.* at 188–89.) [3]

In a decision dated September 29, 2009 ("the second ALJ decision"), ALJ Nisewitz again found that plaintiff was not without fault in accepting the overpayment and that it therefore could not be waived. (*Id.* at 9–16.)The ALJ considered plaintiff's disability in making this decision and concluded that his continued employment and ability to manage his own finances indicated his ability to understand and comply with the reporting requirements. (*Id.* at 15.)The decision directed that recovery be effectuated at a rate of $20 per month. (*Id.*) On May 26, 2011, the Appeals Council declined to review the decision, at which time the second ALJ decision became final. (*Id.* at 2.)

**\*3** In this action, plaintiff seeks review of the determination that he was not without fault in accepting the overpayment. (Compl.(Doc. No. 1).) On January 9, 2012, defendant served plaintiff with its motion for judgment on the pleadings. (Def.'s Lt. to *Pro Se* Pl., dated Jan. 9, 2012 (Doc. No. 12).) Several months later, defendant informed the Court that plaintiff had failed to serve an opposition to the motion. (Def.'s Lt. dated Apr. 18, 2012 (Doc. No. 14).) Plaintiff then filed a response, explaining the reasons for his failure to serve an opposition and providing arguments in response to defendant's motion. (Pl.'s Lt. dated May 14, 2012 (Doc. No. 15).) In an order dated June 21, 2012, the Court accepted plaintiff's letter response as his opposition to defendant's motion. On June 29, 2012, defendant filed its motion for judgment on the pleadings and related documents. (Mot. for J. on the Pleadings (Doc. No. 16).) For the reasons set forth below, defendant's motion is GRANTED.

## LEGAL STANDARD

### I. Social Security Income Benefits and Overpayment

In order to qualify for SSI benefits, a disabled individual must meet, *inter alia,* the resource and income limits established by the Social Security Act. *See* 42 U.S.C. §§ 1381a, 1382(a); 20 C.F.R. § 416.202. The amount of monthly SSI benefits that an individual receives is based in part upon the amount of the individual's income. *See* 42 U.S.C. §§ 1382(a)(1)(A), 1382a. An overpayment is a payment of an amount more than the amount due for a given period. 20 C.F.R. § 416.537(a). SSI recipients are obligated to report any change in income or resources to SSA. 20 C.F .R. § 416.708; *Howard v.*

*Sec'y of Dep't of Health and Human Servs.,* 741 F.2d 4, 8 (2d Cir.1984). If an individual receiving SSI benefits is incorrectly paid more than the amount he is entitled to, the Commissioner is authorized to seek a repayment of the excess amount of benefits. *See* 42 U.S.C. § 1383(b)(1)(A); 20 C.F.R. §§ 416.537, 416.550–90; *Howard,* 741 F.2d at 8.

When there has been an overpayment, the requirement to repay it can be waived only in limited circumstances. The Commissioner will grant a waiver only if an individual is 1) "without fault" and 2) repaying the overpayment would a) defeat the purpose of the Act; b) be against equity and good conscience; or c) impede the efficient or effective administration of the SSI program. 42 U.S.C. § 1383(b) (1)(B); 20 C.F.R. § 416.550. If there is fault, the second prong of the test need not be considered; fault is enough to deny a request for a waiver of overpayment. *Chlieb v. Heckler,* 777 F.2d 842, 846 (2d Cir.1985) ("[W]e need not consider whether recovery of the overpayments would defeat the purpose of Title II or would be against equity and good conscience, since those factors come into play only if the recipient is without fault."). [4]

When considering whether there is fault, the Commissioner must consider all pertinent circumstances, including:

> **\*4** the individual's understanding of the reporting requirements, the agreement to report events affecting payments, knowledge of the occurrence of events that should have been reported, efforts to comply with the reporting requirements, opportunities to comply with the reporting requirements, understanding of the obligation to return checks which were not due, and ability to comply with the reporting requirements (e.g., age, comprehension, memory, physical and mental condition).

20 C.F.R. § 416.552. The Commissioner will determine that an individual is at fault if that individual 1) failed to furnish information he knew or should have known to be material; 2) made an incorrect statement he knew or should have known to be incorrect; or 3) did not return a payment he knew or could have been expected to know was incorrect. *Id.; Howard,* 741 F.2d at 7–8. "No showing of bad faith is required; rather, an honest mistake may be sufficient to

constitute fault. [Furthermore,] t]he fact that the SSA may have been at fault in making the overpayment does not relieve the recipient from liability for repayment if the recipient also was at fault." *Center v. Schweiker,* 704 F.2d 678, 680 (2d Cir.1983).

## II. Standard of Review
"The Secretary's conclusion that a claimant was not without fault is a factual determination that must be upheld if it is supported by substantial evidence in the record as a whole." *Howard,* 741 F.2d at 8. " 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "[W]here substantial evidence supports the Commissioner's conclusions, this Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review. Only the Commissioner's legal conclusions may be reviewed *de novo* without deference." *Beres v. Chater,* Civ. No. 93–CV–5279, 1996 WL 1088924, at \*5 (E.D.N.Y. May 22, 1996) (citing *Brown v. Bowen,* 905 F.2d 632, 638 (2d Cir.1990); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)).

## DISCUSSION

In his second decision, ALJ Nisnewitz correctly identified the relevant legal and factual issues, and applied the appropriate legal standards. The relevant issues included whether the claimant received an overpayment, and, if so, whether he was at fault in accepting it, meaning he knew or should have known the payments were incorrect or failed to furnish material information. (Admin. R. at 13.) ALJ Nisnewitz also properly noted that the remainder of the waiver analysis-consideration of whether recovery would defeat the purposes of the Social Security Act or be against equity and good conscience-was necessary only "if the claimant is found to be without fault." [5] (*Id.*) Furthermore, as explained below, his findings as to the relevant issues are supported by substantial evidence in the record.

## I. Plaintiff Was Overpaid
**\*5** In his second decision, ALJ Nisnewitz found that plaintiff was overpaid in the amount of $4,666.42 and noted that plaintiff never contended that such amount was incorrect

or not received. (Admin. R. at 14.) There was substantial evidence in the record for this finding, in the form of multiple SSA database queries showing the amount in checks sent to plaintiff, his income for those periods, and an overpayment balance of $4,666.42. (Admin.R. 47–57.) [6]

Plaintiff makes a number of arguments in his petition and opposition papers relating to the overpayment amount. First, he states that, after he requested review of the second ALJ decision from the Appeals Council, he received a letter from his credit monitoring agency "with a zero(0) [sic] balance for Social Security Administration."(Compl. ¶ 3; *id.* at 2 (attaching the referenced document).) The Court will not consider this new evidence in reviewing the Commissioner's final decision as it is not properly part of the administrative record. *See Jones ex rel. T.J. v. Astrue,* Civ. No. 07–CV–4886 (SLT), 2010 WL 1049283, at *10 (E.D.N.Y. Mar.17, 2010). Nor does this evidence warrant a remand since it is not "new evidence which is material and [ ] there is [not] good cause for the failure to incorporate such evidence into the record."*See Lisa v. Sec'y Dep't of HHS,* 940 F.2d 40, 43 (2d Cir.1991). Moreover, the notification, dated December 7, 2009, allegedly reflecting a zero balance with SSA bears no relevance to the appropriate calculation of plaintiff's overpayment in 1999 and 2000.

Plaintiff theorizes that the zero balance on his credit report reflects a change in SSA's position on an entirely separate alleged underpayment that plaintiff believes he is due. (Pl.'s Mem. at 1–2, 20.) Several times during these proceedings, plaintiff has recounted his efforts to obtain a refund from SSA based on his belief that he was being underpaid. At the hearing in this case, plaintiff testified that he learned in 1997 that other SSI recipients were receiving higher benefits than he, and he went to a local SSA office to request more benefits. (Admin. R. at 133, 182.) He testified that he was owed approximately $9,000, [7] and that the SSA employee he spoke with in 1997 promised him a $5,000 to $10,000 refund and help finding a job. (*Id.* at 182.)The role of this Court is to review the decision of the ALJ with respect to the alleged overpayment in 1999 and 2000. Any alleged underpayment prior to 1998 is not on the administrative record, and is therefore not before this Court.

Plaintiff also refers this Court to the documents accompanying his request to the Appeals Council. This Court may consider these materials, despite that they were not presented to the ALJ, since "new evidence submitted to the Appeals Council following the ALJ's decision becomes part

of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision."*Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). Within these documents, plaintiff states: "The records that I have enclosed to prove the correct amount that is really owed is 1) A trial work period sheet where "the allowable figure for 1999 for me was $700–/mth and I made $255–/mth average for 1999."(Compl. at 4 .) This statement confuses several aspects of the relevant overpayment calculation. First, income eligibility for SSI benefits is calculated on a month by month basis, not averaged by month over the year; plaintiff is responsible for overpayments in months in which he was paid more than was due, depending on his income in the relevant month, not the average for the year. *See* 20 C.F.R. § 416.1100 ("We count income on a monthly basis."). Second, plaintiff's source for the $700 figure is the monthly "substantial gainful activity" amount. Reliance on this figure is misplaced. The substantial gainful activity amount relates to determining the "disabled" status that is required for benefits; a claimant is presumably not disabled, and not entitled to SSI benefits, if he makes more than the substantial gainful activity amount. 20 C.F.R. §§ 416.971, 416.974. Here, however, plaintiff has not been determined to be ineligible for benefits based on not being "disabled," but instead based on his income—a separate eligibility consideration. Plaintiff's relevant earnings are measured against the maximum SSI benefit, which is separately set. *See* Office of the Commissioner; 1999 Cost–of–Living Increase and Other Determinations, 63 Fed.Reg. 58446–01 (Oct. 30, 1998) (setting SSI benefits at $500 for 1999); Office of the Commissioner; Cost–of–Living Increase and Other Determinations for the Year 2000, 64 Fed.Reg. 57506–04 (Oct. 25, 1999) (setting SSI benefits at $512 for 2000). [8]

**\*6** In his complaint, plaintiff also alleges that he is being charged "an extra $3,000.00," presumably separate from the alleged $9,000 underpayment discussed above. (Compl.¶ 3.) In his memorandum in support of his appeal, plaintiff formulates the amount a little differently, saying "THE OVERPAYMENT AMOUNT was off By at least $3,300.00."(Pl.'s Mem. at 1, 10.) Plaintiff provides no calculations or explanations of the alleged $3,000 overcharge, let alone supporting evidence. The only calculation provided by plaintiff involved multiplying $240 (labeled "monthly SSA") by twelve (labeled "12 mths in 1999"), resulting in $2,880 (labeled "adjusted amount not owed for 1999"). (Compl. at 4 ($240 * 12 = $2,880).) He then subtracted the "adjustment" of $2,880 from $4,660, which he labeled "current amount owed," leaving $1780, labeled "amount to

be paid back." (*Id.* ($4,660–$2,880 = $1,780).) No other explanation is provided. It is unclear if this $2,880 is the same as plaintiff's alleged $3,300 overcharge. In any event, plaintiff's calculations appear to reflect a misunderstanding that any SSA benefits he received should be directly subtracted from the amount that is owed due to overpayment. The Court sees no reason why this would be true. Any benefits received by plaintiff were presumably included in the relevant calculation of his benefits due, which, in the plaintiff's case, were zero. Such benefits would have been included in his unearned income, which is rightly included in his countable income, which is deducted from the SSI benefit amount to determine his benefits due. *See* 20 C.F.R. § 416.1100 ("[T]he more income you have the less your benefit will be."); 20 C.F.R. § 416.1104 ("There are different types of income, earned and unearned, and we have rules for counting each."); 20 C.F.R. § 416.1121(a) ("This unearned income .... includes, for example ... social security benefits...."). Plaintiff presents nothing to the contrary. Any alleged error or adjustment amount is therefore entirely unsupported by the record.

Plaintiff notes in his memorandum the "very unsecure job market" and prevalence of foreclosures at the time of his filing, and explains that he presented "these facts" to his local SSA office, and "SSA Issued a waiver for the debt that Mrs. Miller with the Jamaica branch Overrided 8 months after it was issued and sent me a monthly bill for $165.00."(Pl.'s Mem. at 17, 20.) The Court reads this statement to allege that, after the events on the record below, plaintiff went to SSA, and the agency issued a waiver, which was later revoked. Evidence related to this alleged visit is not a valid or relevant part of the administrative record. Moreover, to the extent that the occurrence of this alleged "waiver" is predicated on plaintiff's earlier espoused belief that his credit report reflects a change of heart on the part of SSA, (Pl.'s Mem. at 1–2), it is pure speculation and entirely irrelevant to the issues at hand. There is substantial evidence in the record for the finding that plaintiff was overpaid during 1999 and 2000 in the amount of $4666.42, and no relevant evidence has been presented to this Court to the contrary.

## II. Plaintiff Was Not Without Fault

**\*7** In his second decision, ALJ Nisnewitz found that plaintiff was not without fault in accepting the overpayment. (Admin.R. 14–15.) Plaintiff was at fault if he 1) failed to furnish information he knew or should have known to be material; 2) made an incorrect statement he knew or should have known to be incorrect; or 3) did not return a payment he knew or could have been expected to know was incorrect.

*Id.*; *Howard,* 741 F.2d at 7–8. The ALJ found that plaintiff failed on two counts, failing to furnish information and failing to return a payment known to be incorrect. He found that plaintiff starting working in 1999, but failed to inform SSA of the change, despite knowing that such information was material. (*Id.* at 14.)He also considered plaintiff's testimony that he spoke on the telephone with someone and told them he was working, but failed to remember who he spoke with or when. (*Id.* at 15.)And he considered plaintiff's "Request for Waiver or Overpayment Recovery," wherein he stated his belief that he should only have to pay back a portion because it was SSA who made a "clerical error." (*Id.*) Based on this evidence, ALJ Nisnewitz found that plaintiff was aware that he was not entitled to continue receiving benefits, and that he did not return the payments despite that he knew or could have been expected to know they were incorrect. (*Id* .) The ALJ also considered, as required by the remand order of the Appeals Council, whether plaintiff's paranoid schizophrenia affected his capability to meet his reporting requirements. ALJ Nisnewitz considered that in 1999 and 2000, plaintiff was able to work for periods of full-time work and handle his personal finances "effectively and without assistance." (*Id.*) The ALJ therefore found that plaintiff could understand and comply with his reporting requirements, and that he was at fault in causing the overpayment. (*Id.*)

There was substantial evidence for these findings. In his waiver request, plaintiff indicated that he notified SSA about the change that made him overpaid, yet provided no explanation of how or when he actually notified them, never explicitly claiming to have told anyone that he was working. (Admin. R. at 30.) Instead, he wrote that he spoke to someone and requested a waiver, and he explained how he was using the money. (*Id.*) The Court finds it telling that plaintiff did not explicitly claim to have met his obligations at that time. When asked at a hearing whether he notified SSA, plaintiff explained that SSA "should have known" because he previously told them he was looking for work, and he believed that "SSA knows everything." However, the question is not whether SSA knew he had begun working, but whether plaintiff complied with his reporting obligations. Plaintiff cannot meet his affirmative obligation by implication. *See Howard,* 741 F.2d 4, 7–8 (finding claimant was not without fault despite that she claimed to have sent letters that might inform SSA of her change in resources because the letters were not sent for that purpose, and she could not meet her burden by "notification at random or by implication" (quoting the ALJ)). It was not until much later in his testimony that plaintiff claimed to have "more or less" told someone in SSA

that he was working. He offers no details, let alone proof, of the conversation. The ALJ did not find this credible, and neither does this Court. Plaintiff testified that he did indeed sign a statement at the time of his application for benefits that he would inform the agency if he went back to work. (Admin. R. at 188–89.) This reflects an awareness of his reporting obligation, and a failure to meet that obligation renders him not without fault. *See, e.g., Langella v. Bush,* 161 Fed. App'x 140, 142 (2d Cir.2005) (affirming finding of fault as supported by substantial evidence where appellant had signed a statement indicating that his reporting responsibility had been explained to him).

**\*8** Plaintiff's testimony about his signed statement also reflects his understanding of the relevance that his working status had on his entitlement to benefits, and therefore the error evident in the continuation of payments—an independent basis for a finding that he was without fault. The testimony that immediately followed is even more telling. When plaintiff claimed to have told an SSA employee that he had begun working, thereby revealing his understanding that his income was material to his entitlement, the ALJ asked, "Well, why did you continue to take the money if you knew you were working?"Plaintiff replied, "Take the money? I didn't have enough money to get by on. I was just evicted. I lost everything. I didn't even have any clothes to go to work with."(*Id.* at 141.)Even if plaintiff notified SSA of his new work, this testimony is substantial evidence for the ALJ's finding that plaintiff failed to return payments he knew were incorrect. *See Howard,* 741 F.2d at 8 (affirming finding that claimant was not without fault as supported by substantial evidence where testimony demonstrated an awareness that claimant was no longer entitled to benefits due to change in income). Plaintiff even claimed to have told SSA to stop payments. (Admin. R. at 30); *see Center,* 704 F.2d at 680 (affirming finding that claimant was not without fault as supported by substantial evidence where record reflected that claimant requested that SSI benefits be terminated). Plaintiff's repeated argument that it was SSA's clerical error that was the cause of the overpayment demonstrates further that he understood that the payments were erroneous. An error on the part of SSA does not relieve plaintiff of his duties, and he is still not without fault in accepting the payments. *Center,* 704 F.2d at 680.

During the second hearing in this case, ALJ Nisnewitz questioned plaintiff about his mental status and treatment during the period of overpayment, with the aim of complying with the remand order of the Appeals Council. (Admin. R. at 124.) In his decision, the ALJ recounted that claimant was diagnosed in 1995 with paranoid schizophrenia, but found that the evidence demonstrates that he was nevertheless capable of abiding by his reporting requirements. (*Id* . at 15.)For this finding, the ALJ relied on evidence that plaintiff returned to full-time work in 1999 and continued to work in 2000, during the period of overpayment. The ALJ reasoned that if plaintiff "could perform full time work activity and handle his personal finances effectively and without assistance, it is clear that he could also understand and comply with his obligation to inform the [SSA] in a timely fashion of his return to work."(*Id* .)

There is substantial evidence for this finding. Plaintiff testified that he has not been hospitalized for his condition since 1995, that he discontinued medication around the end of 1998, and that his mental status never prevented him from working. (*Id.* at 174.)He also testified that he took the initiative to visit a SSA office in 1997, seeking to increase his benefits.(*Id.* at 182.)Since that time, plaintiff has continued to actively engage with SSA in relation to his benefits, requesting a waiver, making multiple visits to offices, participating in a personal conference with an SSI representative to review his file and explain his case, requesting reconsideration, filing letters and appeals, and mostly doing so without representation. (*Id.* at 30, 37, 43, 110, 119, 133, 182.)He also marshaled SSA publications in support of his position, going back almost to the time of the overpayment, (*id.* at 73–75), some of which he testified to having received prior to the overpayment, (*id.* at 147). Plaintiff's active effort to secure more benefits before the overpayment, his efforts to resist recovery of the overpayment, and his attempt to make arguments based on published policies of the SSA, demonstrate an ability to understand his obligations and the impact that his work status had on the appropriateness of his receipt of benefits. The fact that plaintiff appears to be easily confused, a characteristic displayed at the hearing and considered by the ALJ, does not persuade the Court to reach an alternative conclusion. *See, e.g., Howard,* 741 F.2d at 8 (declining to find claimant not at fault despite being "elderly, illiterate, and easily confused").

**\*9** As there is substantial evidence for the finding that plaintiff was not without fault, this Court will not address the other prongs of the waiver analysis. Plaintiff is not entitled to a waiver, and SSA is entitled to recover the overpayment.

**CONCLUSION**

For the reasons herein, defendant's motion for judgment on the pleadings is GRANTED. The Clerk of Court is respectfully directed to enter judgment accordingly, send a copy of the judgment and this order to plaintiff, and close this case.

SO ORDERED.

Footnotes

1   Unless otherwise indicated, Administrative Record page citations refer to the printed page numbers in the top right corner of the record itself, not the Electronic Filing page number stamp added to the filed document.

2   The record does not include any direct proof that the conference took place. However, SSA did make its decision on that day, and the hearing transcript reflects that plaintiff did review the relevant calculations with a representative at some point. (*Id.* at 39, 191.)

3   The ALJ also engaged in a discussion with plaintiff's representative on the record wherein the representative informed the ALJ that she advised plaintiff to concede fault. (*Id.* at 185–93 .)The statements of the ALJ and the representative during this exchange do not constitute evidence, and this Court will not consider them as such.

4   As explained in *Howard,* "the basic principles in overpayment cases are the same regardless of the type of benefit allegedly overpaid, and authorities interpreting the regulations relating to insurance benefits are pertinent to SSI cases as well." 741 F.2d at 7 n. 1. Cases relating to such other types of benefits are therefore cited herein without further distinction.

5   ALJ Nisnewitz went on to make findings as to the second prong of the waiver test, despite having found that plaintiff was not without fault.

6   In particular, a query dated November 4, 2003 reflects computations of periods of overpayment (labeled "TOP") including February of 1999 ("0299"), November and December of 1999 ("1199"), and January through October of 2000 ("0100", "0200", "0600", "0900"). (Admin. R. at 56.) Spikes in "PCI," plaintiff's income that is countable against his SSI benefits, can be seen in each month included in those periods. The respective overpayments for those periods appear to be: $356.34 in February 1999, $333.34 in November and December of 1999, and $364.34 in January through October of 2000, totaling $4,666.42 ($356.34 + ($333 .34 * 2) + ($364.34 * 10) = $4,666.42).(*Id.*) It is not clear from the query why the state amount ("SMA") of $23.00 in November and December of 1999 was not counted in the overpayment amount. However, plaintiff does not challenge this aspect of the calculation, and, if it was an error, it was in his favor.

7   Plaintiff testified that for three years he was getting $250, while he heard others were getting $500. (Admin. R. at 182.) This is presumably the source of his alleged $9,000 underpayment (($500–$250) * 36 months = $9,000). In his memorandum in support of this appeal, he suggests that the underpayment may be related to a change in his living arrangements. (Pl.'s Mem. at 18.) No evidence has been submitted at any stage of these proceedings as to these issues, and the ALJ had no duty to develop the record as to the underpayment issue, as it was not before him.

8   To the extent that plaintiff is arguing that he is entitled to a trial work period, this argument also fails. The "trial work period" outlined in 20 C.F.R. § 404.1592, during which time a benefit recipient is entitled to test her ability to work without threatening her "disabled" status, does not apply to Supplemental Security Income benefits. *See Newton v. Charter,* 92 F.3d 688, 693 n. 1 (8th Cir.1996); *Walker v. Sec'y of Health & Human Servs.,* 943 F.2d 1257, 1258 (10th Cir.1991); *Lichtenstein v. Barnhart,* Civ. No. 05–CV–111, 2006 WL 1554630, at *4 (D.Me. June 1, 2006); *Hovenga v. Apfel,* Civ. No. C98–3076–MWB, 1999 WL 33657690, at *14 n. 4 (N.D.Iowa Dec.17, 1999).

---

**End of Document**                                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

134 Fed.Appx. 485
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Maryann HANNON, Plaintiff-Appellant,

v.

Jo Anne B. BARNHART, Commissioner Social
Security Administration, Defendant-Appellee.

No. 04-2429-CV.   |   June 22, 2005.

Appeal from the United States District Court for the Eastern
District of New York (Joanna Seybert, District Judge).
UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED **486** AND DECREED that
the judgment of said district court be and it hereby is
AFFIRMED.

**Attorneys and Law Firms**

Maryann Hannon, Miller Place, NY, for Appellant.

Varuni Nelson, Assistant United States Attorney (Roslynn R.
Mauskopf, United States Attorney for the Eastern District of
New York, Kathleen A. Mahoney, Assistant United States
Attorney, Karen T. Callahan, Special Assistant United States
Attorney, on the brief), Brooklyn, NY, for Appellee.

PRESENT: WALKER, Chief Judge, HALL, and GIBSON, [*]
Circuit Judges.

## SUMMARY ORDER

Plaintiff-appellant MaryAnn Hannon appeals from the March
29, 2004, judgment of the district court granting defendant-
appellee's cross-motion for judgment on the pleadings,
pursuant to Federal Rule of Civil Procedure 12(c), on
Hannon's appeal, filed pursuant to 42 U.S.C. § 405(g),
challenging the determination of the Commissioner of the
Social Security Administration ("SSA") that Hannon is liable
for overpayments of disability benefits she received between
October 1993 and May 1996. In so ruling, the district court
affirmed the administrative law judge's ("ALJ") decision,
which denied Hannon a waiver of liability after concluding
that she was not without fault in receiving the erroneous
payments.

On appeal, Hannon argues that the ALJ erroneously found
her at fault. She asserts that her circumstances warrant a
waiver of recovery of the entire overpayment because she
"faithfully followed" the instructions that were given to her
while she was receiving benefits and the SSA was aware of
her status. In reviewing a district court's decision in a social
security case, we undertake our own "plenary review" of the
administrative record to determine whether the ALJ's decision
is supported by substantial evidence, meaning "such relevant
evidence as a reasonable mind might accept as adequate to
support a conclusion." *Havas v. Bowen,* 804 F.2d 783, 785
(2d Cir.1986).

Section 404(b) of the Social Security Act allows for waiver of
recovery of an overpayment of benefits in certain instances.
Specifically, the regulations dictate that there will be no
adjustment or recovery in any case where (1) an overpayment
has been made to an individual who is without fault, and (2)
when "adjustment or recovery would either defeat the purpose
of the Act, or be against equity and good conscience." 20
C.F.R. § 404.506. In determining a party's "fault" in receiving
and accepting an overpayment of benefits, the SSA considers
whether the overpayment resulted from:

(a) An incorrect statement made by the individual that he
knew or should have known to be incorrect; or

(b) Failure to furnish information that he knew or should
have known to be material; or

(c) With respect to the overpaid individual only, acceptance
of a payment that he either knew or could have been
expected to know was incorrect.

20 C.F.R. § 404.507. We conclude, as did the district
court, that there was substantial evidence to support the
ALJ's determination. It is undisputed that Hannon received
an overpayment of benefits. In addition, Hannon knew or
should have **487** known that she was not entitled to the
continuing disability benefits after she received the SSA's
notice in October 1993 informing her that her disability
benefits had terminated. As Hannon did not meet her burden
of establishing that she was "without fault," she was properly
denied a waiver of recovery. *See* 42 U.S.C. § 404(b); 20
C.F.R. §§ 404.506, 404.507.

For the foregoing reasons, the judgment of the district court
is hereby AFFIRMED.

**Parallel Citations**

2005 WL 1469152 (C.A.2 (N.Y.))

Footnotes

\*          The Honorable John R. Gibson, Senior Circuit Judge of the Court of Appeals for the Eighth Circuit, sitting by designation.

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.                                        2